UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA, and the STATE
OF NEW YORK *ex rel.* MARIANNE T. O'TOOLE,
*as Trustee of the Bankruptcy Estate of Robert
Douglas*,

                              Plaintiffs,

                  -v.-

COMMUNITY LIVING CORPORATION;
CREATIVE ESCAPES, LLC; DELORES
LULGJURAY; JACK MUNGOVAN; DOUGLAS
JURCZAK; CHRISTINE STILE; and JOHN
PORCELLA,

                              Defendants.

17 Civ. 4007 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

Plaintiff Marianne O'Toole, serving as Trustee for the Bankruptcy Estate of Relator Robert Douglas, brings this action on behalf of the United States and the State of New York against Defendants Community Living Corporation ("CLC"), Christine Stile, and John Porcella (together, the "CLC Defendants"), as well as Creative Escapes, LLC, Delores Lulgjuray, Jack Mungovan, and Douglas Jurczak.  CLC bills for and receives reimbursements from Medicaid as part of its treatment of developmentally disabled individuals ("consumers"), and Plaintiff alleges that all Defendants participated in a variety of schemes to defraud Medicaid, in violation of the False Claims Act, 31 U.S.C. §§ 3729-3733 (the "FCA"), and the New York False Claims Act, N.Y. State Fin. Law §§ 187-194 (the "NYFCA").

Specifically, Plaintiff alleges that: (i) CLC's management conspired with its employees to create Creative Escapes, LLC — a vacation company — and then induced CLC's consumers to use Creative Escapes's services; (ii) CLC management made false statements to the New York State Office for People with Developmental Disabilities ("OPWDD") by directing employees to sign documentation attesting that services were provided long after the services had actually been provided; (iii) CLC engaged in improper drug dispensing by failing to administer dosages or by providing drugs prescribed for one consumer to other consumers; (iv) CLC permitted consumers to engage in sexual relationships with one another despite the consumers lacking the mental capacity to properly consent; and (v) CLC failed to report issues of harm or potential harm — known as "reportable incidents" — to OPWDD.  Plaintiff also alleges that Relator was terminated in retaliation for his reporting of the above fraudulent schemes, in violation of the FCA and the NYFCA.

The CLC Defendants have moved to dismiss this action under Federal Rule of Civil Procedure 12(b)(6).  They argue, first, that Plaintiff should be judicially estopped from bringing her claims and, second, if judicial estoppel does not apply, that Plaintiff has nevertheless failed to state a claim upon which relief can be granted.  For the reasons set forth in the remainder of this Opinion, the CLC Defendants' motion is granted in part and denied in part.

## BACKGROUND[1]

### A.    Factual Background

#### 1.    The Parties

Plaintiff is the Chapter 7 Trustee of the Bankruptcy Estate of Relator. (SAC ¶ 12).  Relator was an employee of CLC from at least 2008 until December 14, 2014, the date of Relator's termination.  (*Id.* at ¶¶ 80, 92).[2] Relator's responsibilities included maintaining all records and documents relating to reportable incidents, serious reportable incidents, and allegations of abuse.  (*Id.* at ¶ 80).  Relator also had other responsibilities, including: (i) providing files, documents, and information for OPWDD surveys of CLC's properties; (ii) overseeing fire safety; (iii) conducting site visits of CLC's properties and reporting findings from those visits; and (iv) conducting quality of life surveys with consumers.  (*Id.* at ¶¶ 81-84).

Creative Escapes, LLC is a limited liability company located in New York and owned and operated by Lulgjuray, Mungovan, and Jurczak.  (SAC ¶ 16). All three individuals are also employees of CLC.  (*Id.* at ¶¶ 17-19).  Creative

---

[1]    The facts in this Opinion are drawn from Plaintiff's Second Amended Complaint ("SAC" (Dkt. #50)), which is the operative pleading in this action.  The Court also relies on the exhibits attached to the Declaration of Robert W. Sadowski ("Sadowski Decl., Ex. [ ]" (Dkt. #62)) and the exhibits attached to the Certification of Claudia A. Costa ("Costa Cert., Ex. [ ]" (Dkt. #65)).

For ease of reference, the Court refers to the CLC Defendants' opening brief as "Def. Br." (Dkt. #58); to Plaintiff's opposing brief as "Pl. Opp." (Dkt. #61); and to the CLC Defendants' reply brief as "Def. Reply" (Dkt. #64).

[2]    The SAC gives December 14, 2019, as the date of Relator's termination.  (SAC ¶ 92). Given the rest of the timeline laid out in the SAC, though, the Court assumes the actual year of Relator's termination was 2014, and attributes the misdating to scrivener's error.

3

Escapes takes individuals with developmental disabilities, including CLC's consumers, on vacations across the world. (*Id.* at ¶ 16).

CLC is a non-profit agency created in 1991, with its principal office in Mount Kisco, New York. (SAC ¶ 15). CLC is funded and licensed by the OPWDD, and it provides residential, vocational, and other services to consumers. (*Id.*). CLC operates 39 residential sites — known as Individual Residential Alternatives ("IRAs") — each of which is separately licensed and regulated by OPWDD. (*Id.*). Plaintiff alleges that Stile and Porcella are either the owners, managers, or directors of CLC, and that Stile was Relator's supervisor. (*Id.*).

Relevantly for this action, CLC bills for and receives reimbursements from Medicaid. (SAC ¶ 3). Medicaid is a joint federal-state program that provides healthcare benefits for eligible beneficiaries, which include the disabled. (*Id.* at ¶ 20). Each state that participates in Medicaid has its own agency that administers the program. (*Id.*). Enrollment in Medicaid carries certain requirements. In general, Medicaid will only reimburse for services that are medically necessary and appropriate, and it will not reimburse for services that are inappropriate, improper, unnecessary, excessive, inaccurately described, or that constitute unacceptable practices. (*Id.* at ¶¶ 35-36). Moreover, New York regulations include compliance with all New York State Department of Health ("DOH") regulations within the definition of acceptable practices. (*Id.* at ¶ 37). Further emphasizing the importance of following relevant regulations, an entity seeking to participate in Medicaid must fill out

an enrollment form that requires the entity to certify that it will comply with
DOH regulations.  (*Id.* at ¶ 38).  The enrollment form also requires that any
claim for payment be true, accurate, and complete.  (*Id.*).

CLC is further required to comply with New York regulations because it
participates in the Home and Community-Based Services ("HCBS") Waiver
Program, which allows states to meet the needs of people who prefer to get
long-term care services and support in their home or community, as opposed
to an institutional setting.  *Home and Community-Based Services 1915(c)*,
Medicaid.gov, https://www.medicaid.gov/medicaid/home-community-based-
services/home-community-based-services-authorities/home-community-
based-services-1915c/index.html.  In New York, HCBS waiver services are
regulated by OPWDD.  (SAC ¶ 29).  To deliver HCBS waiver services, an entity
must both complete an HCBS Provider Agreement and operate in accordance
with specific provisions of the New York Codes, Rules and Regulations (the
"NYCRR").  (*Id.* at ¶¶ 31-32).

Plaintiff has highlighted several regulations that, she claims, are relevant
to the issues in this action.  (SAC ¶¶ 33, 39-40).  These include: (i) regulations
prohibiting the commercial exploitation of individuals; (ii) regulations
protecting an individual's right to express their sexuality as limited by their
consensual ability to do so; (iii) regulations protecting an individual's use of his
or her personal money and property; and (iv) regulations prohibiting an agency
or sponsoring agency from purchasing any item or service for which public
funds were provided.  (*Id.* at ¶ 33).  Other relevant regulations mandate the

reporting of reportable incidents to OPWDD, and include within reportable incidents the administration of a prescription drug without a prescription, the failure to provide adequate medical care, and any suspected financial exploitation.  (*Id.*).  Finally, New York regulations require that providers prepare and maintain contemporaneous records regarding their right to receive payment, to submit claims only for services actually furnished, and to submit claims in the manner required by the relevant department.  (*Id.* at ¶ 39).

### 2.   The Alleged Fraudulent Schemes

### a.   The Fraudulent Billing Scheme

Plaintiff alleges that CLC uses a form known as the HCBS Waiver Service Documentation IRA ResHab Daily Checklist (the "Checklist") in order to substantiate its claims for reimbursement from Medicaid.  (SAC ¶ 42).  CLC is required to fill out both daily narrative notes, which must be filled out contemporaneous to when the consumer received the relevant service, and a monthly summary note.  (*Id.* at ¶ 43).  Staff who are providing a service initial the date on which the service is provided, and therefore attest that the service was in fact provided on that date.  (*Id.* at ¶ 44).  This initialing must occur on the same day as the service is provided.  (*Id.*).  In general, services are billed on a monthly basis.  (*Id.* at ¶ 45).

Plaintiff alleges that CLC had a widespread problem of its staff members failing to complete or initial their Checklists at the time services were provided. (SAC ¶ 49).  In response to this issue, Stile directed CLC's accounting department to draw up a list of staff members who had failed to complete their

Checklists properly.  (*Id.* at ¶ 50).  Stile further required those staff members to come to CLC's Accounting Department and sign, initial, and note the consumer's response to the service, even if the service had been provided several weeks beforehand.  (*Id.*).  This practice became common at CLC, and the list of negligent staff members often exceeded 30-40 people.  (*Id.*).  Plaintiff alleges that Relator was personally called to Accounting and asked to initial services non-contemporaneously.  (*Id.*).  Plaintiff further alleges that not only were staff members directed to complete and sign Checklists non-contemporaneously, but they were also directed to sign Checklists for services that had not been provided.  (*Id.* at ¶¶ 53-54).

As a specific example of this scheme, Plaintiff alleges that Relator was conducting an internal audit of two of CLC's apartments in the last week of October 2011 when he discovered that no documentation had been completed for the month of October.  (SAC ¶ 52).  Notably, however, Plaintiff offers no allegation that any claims in connection to those two apartments were submitted to Medicaid.  Additionally, Plaintiff alleges that in October or November of 2014, Relator was working with Renette Gordon at CLC's Moseman Residence.  (*Id.* at ¶ 51).  Allison McKay, the Regional Program Coordinator, entered the Moseman Residence and discovered that Checklists had not been completed for one week.  (*Id.*).  Gordon then filled in the Checklists for eight residents at Moseman Residence, despite the fact that the services had been provided well beforehand.  (*Id.*).  Again, however, Plaintiff

offers no allegation that any claims were submitted to Medicaid based on those Checklists.

### b.    The Failure to Provide Proper Medical Care

Plaintiff alleges two unlawful courses of conduct relating to CLC's provision of medical care. *First*, Plaintiff alleges that CLC had a practice of improperly dispensing prescription drugs to consumers. (SAC ¶ 56). This manifested as staff members opening a container of drugs prescribed to one patient and dispensing the drug until the container was empty, regardless of whom the drug was prescribed for. (*Id.*). As an example, Plaintiff alleges that LP, a consumer at CLC, was prescribed Klonopin. (*Id.*). Instead of only using LP's Klonopin for LP, though, staff members instead dispensed the Klonopin to LP and other consumers until LP's pack was empty, at which point staff members would open up a different consumer's pack of Klonopin and dispense it in similar fashion. (*Id.*).

*Second*, Plaintiff generally alleges that CLC failed to provide proper medical care. Plaintiff alleges that employees failed to provide consumers with their prescribed medication in a timely fashion and failed to keep track of whether medications were being properly dispensed and taken. (SAC ¶¶ 58-59). Plaintiff specifically references issues at one of CLC's properties, known as The Commons. (*Id.* at ¶ 57). Plaintiff alleges that Christine N., a nurse at The Commons, was accused of not showing up to work for six months, taking paperwork without notifying staff, threatening staff, and ignoring staff calls for assistance and prescription renewals. (*Id.*). Melanie Taylor, a CLC staff

member, also reported finding at The Commons incorrect dosages of medication, expired medication, incorrect pill counts of controlled medications, and a variety of other issues.  (*Id.*).

### c.   The Failure to Supervise and the Failure to Report

Plaintiff alleges that CLC allowed consumers to engage in sexual intercourse with one another, despite the fact that they lacked the mental capacity to consent.  (SAC ¶ 62).  Specifically, Plaintiff alleges that Relator learned that two consumers — Ms. C and Mr. A — had engaged in sexual activities with one another.  (*Id.* at ¶ 93).  However, Plaintiff alleges that no staff member — including neither Stile nor Porcella — reported the incident to OPWDD.  (*Id.*).  In addition to the above, CLC failed to report other reportable incidents, including an injury to a consumer and a failure to maintain a code-compliant fire alarm system at CLC's Highland Avenue IRA.  (*Id.* at ¶¶ 65-66).  The latter failure resulted in the death of a consumer.  (*Id.* at ¶ 66).

### d.   The Creative Escapes Scheme

As already mentioned, Lulgjuray, Mungovan, and Jurczak — all of whom were CLC employees — created Creative Escapes as a vacation company for individuals with disabilities.  (SAC ¶ 67).  Plaintiff alleges that Creative Escapes targeted, if not preyed upon, CLC's consumers.  (*Id.* at ¶ 68).  Specifically, Lulgjuray, Mungovan, and Jurczak are alleged to have induced the consumers to pay for Creative Escapes's vacations using the allowance each consumer was given by Medicaid.  (*Id.* at ¶¶ 69-70).  Furthermore, Creative Escapes used CLC staff and resources to operate the company.  (*Id.* at ¶ 75).  The company used

CLC's offices and supplies; CLC employees worked for Creative Escapes while they were supposed to be working for CLC; and Creative Escapes used CLC's vans — which were funded by Medicaid — to transport consumers to airports. (*Id.*).  Plaintiff alleges that CLC's employees were fully aware of Creative Escapes's actions and failed to report them to OPWDD or any other authority. (*Id.* at ¶ 76).  Moreover, CLC consciously did not record expenditures for consumer spending, personal allowances, or related expenditures, in order to conceal Creative Escapes's fraudulent activity.  (*Id.* at ¶ 72).

### 3.    Retaliation Against Relator

In the course of his duties at CLC, Relator became aware of the above issues and complained to Stiles and Porcella about them.  (SAC ¶ 85).  Plaintiff alleges that Relator raised the issue of CLC's fraudulent billing with Stile beginning in early 2013, and continued to raise the issue with her on a monthly basis until Relator was terminated in December 2014.  (*Id.* at ¶ 95). Relator also had conversations with Stile about the billing issue in October and November of 2014, when OPWDD conducted an audit of CLC's monthly billing. (*Id.* at ¶¶ 87, 95).  In response to these concerns, Stiles allegedly responded, "What else can I do?  The staff is not following what they are supposed to do." (*Id.* at ¶ 88).  Relator also expressed his concerns about Creative Escapes to Stile on multiple occasions, to which Stile responded that Creative Escapes had been approved by CLC's board of directors.  (*Id.* at ¶ 89).

Beginning in October 2014, Stile hired an employee and began training her to fill Relator's position.  (SAC ¶ 90).  Around the same time, Stile and

Porcella limited Relator's involvement in incident reporting and investigations. (*Id.*).  In early November 2014, Relator learned that Ms. C had been engaging in sexual activities and that the incident had not been reported to the OPWDD or the "Justice Center for Individuals with Disabilities" (the "Justice Center").  (*Id.* at ¶ 91).[3]  On November 5, 2014, Relator had a lengthy discussion with Stile, during which he advised her about: (i) the lack of preventative plans in place to prevent choking concerns in relation to three individual consumers; (ii) the sexual relations between Ms. C and Mr. A; (iii) the fact that Jurczak and Kim Sanders, another employee, were taking days off without reporting leave; (iv) the systemic medication errors at CLC; and (v) the fact that Porcella had directed that no staff member be "decertified" to dispense medications.  (*Id.* at ¶ 93).

At some point, Relator decided to file incident reports with the Justice Center regarding the issues that had come to his attention.  (SAC ¶ 96).  Specifically, Relator filed incident reports concerning: (i) Porcella's failure to investigate Relator's reports; (ii) the sexual activity of Ms. C; (iii) Stile's covering up of an incident involving a consumer identified as Ms. S; (iv) an investigation of a different consumer's broken leg; and (v) Creative Escapes's administration of medication out-of-state.  (*Id.*).  Relator also informed the Justice Center about CLC staff members dispensing the prescription drugs prescribed for one

---

[3]    Plaintiff's brief refers to the Justice Center as the Justice Center for People with Developmental Disabilities.  (Pl. Opp. 3).  The Court believes that Plaintiff is in fact referring to the Justice Center for the Protection of People with Special Needs.  *See* Justice Center for the Protection of People with Special Needs, https://justicecenter.ny.gov.

specific consumer to other consumers.  (*Id.*).  Plaintiff alleges that after Relator
filed these incident reports, either Stile and Porcella were alerted by the Justice
Center that Relator had filed said reports or Stile merely suspected that Relator
had filed a report concerning Ms. C's sexual activity.  (*Id.* at ¶¶ 92, 96).
Regardless, Relator was fired on December 14, 2014.  (*Id.* at ¶ 92).

## B.     Procedural Background

On May 26, 2017, Relator filed this action as a *qui tam* action, on behalf
of himself and on behalf of the United States and the State of New York.  (Dkt.
#9).  The Complaint named CLC, Creatives Escapes, LLC, Lulgjuray,
Mungovan, and Jurczak as Defendants.  (*Id.*).  The Complaint was filed under
seal pursuant to 31 U.S.C. § 3730(b)(2), and the United States and New York
were given the opportunity to decide whether they wished to intervene in the
case.  (*See* Dkt. #8).  On June 7, 2018, Relator and his wife filed a petition for
bankruptcy under Chapter 7.  (*See* Costa Cert., Ex. A).  On March 25, 2019,
upon learning that the United States had declined to intervene in Relator's
case, the Court ordered that the case be unsealed within 30 days' time.  (Dkt.
#8).  In accordance with that Order, the case was unsealed on April 25, 2019.
(*Id.*).

On May 13, 2019, the Court ordered that the parties appear for an initial
pretrial conference on July 11, 2019.  (Dkt. #10).  On June 28, 2019, the Court
adjourned that conference to July 19, 2019 (Dkt. #11), and, on July 17, 2019,
the conference was further adjourned to September 5, 2019 (Dkt. #23).  On
August 16, 2019, CLC requested a pre-motion conference regarding an

12

anticipated motion to dismiss (Dkt. #24), to which Relator responded on August 21, 2019 (Dkt. #25).  The Court found that a pre-motion conference was warranted, and scheduled such a conference for September 12, 2019. (Dkt. #26).  The parties appeared before the Court for the scheduled pre-motion conference on September 12, 2019, and the Court gave Relator until October 11, 2019, to file an Amended Complaint.  (Minute Entry for September 12, 2019).  The Court also gave CLC until October 25, 2019, to determine how it wished to proceed in responding to the Amended Complaint. (*Id.*).

On October 10, 2019, an Amended Complaint was filed.  (Dkt. #31).  The Amended Complaint substituted Plaintiff for Relator and named Stile and Porcella as Defendants.  (*See id.*).  On October 25, 2019, the CLC Defendants filed a letter requesting leave to file a motion to dismiss.  (Dkt. #42).  However, the Court ordered the CLC Defendants to re-file their letter because the letter's length was in violation of the Court's Individual Rules of Practice.  (Dkt. #43). The CLC Defendants re-filed their letter on October 31, 2019 (Dkt. #44), and Plaintiff filed a response on November 6, 2019, in which she requested leave to amend her complaint for the second time (Dkt. #45).  On November 6, 2019, the Court ordered Plaintiff to file a motion to seek leave to file an amended complaint.  (Dkt. #46).  On November 14, 2019, Plaintiff filed a motion seeking leave to further amend her complaint (Dkt. #47), and the CLC Defendants filed an opposing letter on November 21, 2019 (Dkt. #48).  On November 22, 2019, the Court granted Plaintiff leave to file an SAC, but warned Plaintiff that the

Court would be mindful of Plaintiff's prior amendments should another request to amend to be made.  (Dkt. #49).

On December 16, 2019, Plaintiff filed her SAC.  (Dkt. #50).  On December 18, 2019, Plaintiff wrote to the Court requesting additional time to serve Creative Escapes, LLC, Lulgjuray, Mungovan, and Jurczak, all of whom remained unserved at that time.  (Dkt. #51).  In response, the Court gave Plaintiff until February 17, 2020, to serve those unserved Defendants.  (Dkt. #52).  As of the time of this Opinion's issuance, Defendants Creative Escapes, LLC, Lulgjuray, Mungovan, and Jurczak remain unserved.

On January 2, 2020, the CLC Defendants again requested leave to file a motion to dismiss (Dkt. #53), which request Plaintiff opposed on January 9, 2020 (Dkt. #54).  On January 10, 2020, the Court found that a pre-motion conference was not warranted, and instead ordered the parties to submit a proposed briefing schedule by January 17, 2020.  (Dkt. #55).  On January 17, 2020, the Court endorsed the parties' proposed briefing schedule.  (Dkt. #56).  On February 7, 2020, the CLC Defendants filed their motion to dismiss and accompanying memorandum.  (Dkt. #57-58).  Plaintiff filed her opposing papers on March 13, 2020.  (Dkt. #61-62).  The CLC Defendants filed their reply papers on April 3, 2020, rendering the motion ripe for adjudication.  (Dkt. #64-65).

## DISCUSSION

### A.  Plaintiff's Claims Are Not Subject to Judicial Estoppel[4]

Before addressing the merits of each of Plaintiff's claims, the Court considers the CLC Defendants' argument that all of Plaintiff's claims are barred as a matter of judicial estoppel.  (Def. Br. 6).  "The doctrine of judicial estoppel prevents a party from asserting a factual position in one legal proceeding that is contrary to a position that it successfully advanced in another proceeding."  *Coffaro* v. *Crespo*, 721 F. Supp. 2d 141, 145 (E.D.N.Y. 2010) (quoting *Rodal* v. *Anesthesia Grp. of Onondaga, P.C.*, 369 F.3d 113, 118 (2d Cir. 2004)).  "Judicial estoppel is regularly invoked in the bankruptcy context; specifically, 'judicial estoppel will prevent a party who failed to disclose a claim in bankruptcy proceedings from asserting that claim after emerging from bankruptcy.'"  *Ashmore* v. *CGI Grp., Inc.*, 923 F.3d 260, 272 (2d Cir. 2019) (internal brackets omitted) (quoting *BPP Ill., LLC* v. *Royal Bank of Scotland Grp. PLC*, 859 F.3d 188, 192 (2d Cir. 2017)).  The Second Circuit has explained that in order to invoke judicial estoppel, a movant must show: (i) "a party's later position is clearly inconsistent with its earlier position," and (ii) "the party's former position has been adopted in some way by the court in an earlier proceeding."  *Id.*  Additionally, the Second Circuit often "require[s] a showing

---

[4]     Although the entirety of the CLC Defendants' motion is styled as falling under Rule 12(b)(6), the Court believes that issues of judicial estoppel are better addressed under the rubric of Rule 12(b)(1).  *See Ibok* v. *SIAC-Sector Inc.*, 470 F. App'x 27, 28 (2d Cir. 2012) (summary order) (analyzing issue of whether plaintiff disclosed underlying lawsuit in bankruptcy proceeding under rubric of Rule 12(b)(1)).  Such being the case, the Court may consider evidence outside the pleadings.  *See id.* (citing *Amidax Trading Grp.* v. *S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011)).

that the party asserting the two inconsistent positions would derive an unfair advantage against the party seeking estoppel." *Id.* Finally, judicial estoppel should only be invoked "when the risk of inconsistent results with its impact on judicial integrity is certain." *Id.* (quoting *Adelphia Recovery Tr.* v. *Goldman, Sachs & Co.*, 748 F.3d 110, 116 (2d Cir. 2014)).

In their opening brief, the CLC Defendants argue that judicial estoppel should apply here because Relator failed to disclose this action to Plaintiff during the course of his Chapter 7 bankruptcy proceeding. (Def. Br. 6-8). Having failed to fulfill his disclosure obligations in bankruptcy, Relator cannot now assert his undisclosed claims. (*Id.*). Were Relator the plaintiff in this action, and were it true that Relator had wholly failed to disclose his claims either to the bankruptcy court or to Plaintiff, it is clear that the claims currently before this Court would indeed be barred due to Relator's failure to disclose said claims. *See Azuike* v. *BNY Mellon*, 962 F. Supp. 2d 591, 599 (S.D.N.Y. 2013) (finding that plaintiff's claims were barred because plaintiff had represented to the bankruptcy court that no such claims existed).

However, there are two flaws in the CLC Defendants' argument. *First*, Relator did, in fact, disclose the instant claims to Plaintiff. (*See* Sadowski Decl., Ex. A at 6-7 (showing that Relator's bankruptcy counsel disclosed the instant sealed action to Plaintiff)). *Second*, and more importantly, Relator is not the plaintiff in this action; Marianne O'Toole, the trustee for Relator's Bankruptcy Estate, is. (*See generally* SAC). And "[j]udicial estoppel does not bar a trustee who has been substituted into a … case" because the trustee has

16

neither abandoned any claim nor taken an inconsistent position under oath with regard to any claim.  *Grammer* v. *Mercedes Benz*, No. 12 Civ. 6005 (LTS) (JCF), 2014 WL 1040991, at *6 (S.D.N.Y. Mar. 13, 2014) (citing *Parker* v. *Wendy's Int'l, Inc.*, 365 F.3d 1268, 1272 (11th Cir. 2004)).

In response to this, the CLC Defendants argue that Plaintiff should nevertheless be estopped from proceeding, either because Plaintiff supposedly failed to disclose the instant claims to Relator's creditors or because Plaintiff's counsel did not proceed with this action until after Relator's debts were discharged.  (Def. Reply 3-4).  However, the CLC Defendants offer no evidence that Plaintiff, in her role as trustee, hid the instant claims from creditors. Moreover, there is no evidence before the Court that Plaintiff herself took any inconsistent position before this Court or the bankruptcy court in regards to the instant claims.  Accordingly, the Court finds no basis upon which it may judicially estop Plaintiff's claims, and will now proceed to consider their merits.

## B. The Court Grants in Part and Denies in Part the CLC Defendants' Motion to Dismiss

### 1. Applicable Law

#### a. Motions to Dismiss Under Fed. R. Civ. P. 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in Plaintiff's favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief."  *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted); *see also Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) ("To survive a

motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." (internal quotation marks omitted)). A plaintiff is entitled to relief if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiff's claims across the line from conceivable to plausible." (internal quotation marks omitted) (citing *Twombly*, 550 U.S. at 570)).

That said, a court is not bound to accept "conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (internal quotation marks omitted); *see also Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (internal quotation marks omitted) (quoting *Iqbal*, 556 U.S. at 678)). Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

### b.     The FCA[5]

The FCA, a federal statute "originally aimed ... at stopping the massive frauds perpetrated by large contractors during the Civil War," *Universal Health Servs., Inc.* v. *United States ex rel. Escobar*, 136 S. Ct. 1989, 1996 (2016), "imposes significant penalties on those who defraud the Government," *id.* at 1995. And although "Congress has repeatedly amended the Act, ... its focus remains on those who present or directly induce the submission of false or fraudulent claims." *Id.* at 1996. "A 'claim' includes direct requests to the government for payment as well as claims for reimbursement under federal benefits programs." *United States* v. *N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 286 (E.D.N.Y. 2016). As relevant here, "a private person may bring a civil action" — known as a *qui tam* action — "on behalf of the government, as a 'relator,'" for violations of the FCA. *Id.* (citing 31 U.S.C. § 3730(b)).

In the instant action, Plaintiff alleges that the CLC Defendants have: (i) "knowingly present[ed], or cause[d] to be presented, a false or fraudulent claim for payment or approval" to the Government, in violation of 31 U.S.C. § 3729(a)(1)(A); (ii) "knowingly ma[de], use[d], or cause[d] to be used, a false

---

[5]     Although the NYFCA is a distinct statute from the federal FCA, the former is "closely modeled" on the latter and "New York courts rely on federal FCA precedents when interpreting the NYFCA." *See United States ex rel. Bilotta* v. *Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 509 (S.D.N.Y. 2014); *see also Dhaliwal* v. *Salix Pharm., Ltd.*, 752 F. App'x 99, 100 (2d Cir. 2019) (summary order) ("Additionally, because '[t]he NYFCA follows the federal False Claims Act,' New York courts 'look toward federal law when interpreting the New York act.'" (quoting *State ex rel. Seiden* v. *Utica First Ins.*, 943 N.Y.S.2d 36, 39 (1st Dep't 2012))). Therefore, the Court subsumes its analysis of Plaintiff's NYFCA claims within its analysis of the FCA claims, and considers the claims as coterminous.

record or statement material to [such] a false or fraudulent claim," in violation of 31 U.S.C. § 3729(a)(1)(B); and (iii) "knowingly ma[de] … a false record or statement material to an obligation to pay … the Government, or knowingly conceal[ed] or … avoid[e]d or decrease[d] an obligation to pay … the Government," in violation of 31 U.S.C. § 3729(a)(1)(G).

In order to state a claim under §§ 3729(a)(1)(A) and (a)(1)(B), a plaintiff must show that the defendants (i) "made a claim," (ii) "to the United States Government," (iii) "that is false or fraudulent," (iv) "knowing of its falsity," and (v) "seeking payment from the federal treasury." *Coyne* v. *Amgen, Inc.*, 717 F. App'x 26, 28 (2d Cir. 2017) (summary order) (quoting *United States ex rel. Kirk* v. *Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010)).  By contrast, in order to state a claim under § 3729(a)(1)(G), a plaintiff must show "[i] proof that the defendant made a false record or statement [ii] at a time that the defendant has a presently-existing obligation to the government — a duty to pay money or property." *N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d at 287 (quoting *United States ex rel. Kester* v. *Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 367-68 (S.D.N.Y. 2014)).

"*Qui tam* complaints filed under the FCA, because they are claims of fraud, are subject to Rule 9(b)." *United States ex rel. Chorches* v. *Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017) (citing *United States ex rel. Ladas* v. *Exelis, Inc.*, 824 F.3d 16, 26 (2d Cir. 2016)).  In general, Rule 9(b) provides that when a party alleges fraud, that party "must state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).

Particularity, in turn, requires that a complaint "[i] specify the statements that the plaintiff contends were fraudulent[;] [ii] identify the speaker[;] [iii] state where and when the statements were made[;] and [iv] explain why the statements were fraudulent." *Chorches*, 865 F.3d at 81 (quoting *Ladas*, 824 F.3d at 25).

The weight of authority in this Circuit supports the proposition that, for claims brought under §§ 3729(a)(1)(A) and (a)(1)(B), Rule 9(b)'s particularity requirement applies not just to allegations of fraudulent schemes, but also to the submission of false claims. *See N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d at 288 (explaining that "allegations as to the existence of an overall fraudulent scheme do not plead fraud with particularity," and that FCA claims must also "allege the particulars of the false claims themselves"); *United States ex rel. Forcier* v. *Comput. Scis. Corp.*, 183 F. Supp. 3d 510, 520 (S.D.N.Y. 2016) (explaining same); *United States ex rel. Kester* v. *Novartis Pharm. Corp.*, 23 F. Supp. 3d 242, 257-58 (S.D.N.Y. 2014) (explaining same). Although this typically requires a plaintiff to "provide details of actual bills or invoices submitted to the government," *see Chorches*, 865 F.3d at 93, a plaintiff may allege that fraudulent claims were submitted based on information and belief where (i) the plaintiff "make[s] plausible allegations that the bills or invoices actually submitted to the government were uniquely within the defendant's knowledge and control," and (ii) the plaintiff "adduce[s] specific facts supporting a strong inference of fraud," *United States ex rel. Gelbman* v. *City of*

*New York*, 790 F. App'x 224, 248 (2d Cir. 2019) (summary order) (internal

brackets omitted) (quoting *Chorches*, 865 F.3d at 83).

### 2. Plaintiff Has Failed to Allege Violations of 31 U.S.C. § 3129 or N.Y. State Fin. Law § 189

#### a. Plaintiff Has Failed to Meet the Pleading Requirements of Rule 9(b)

Although they broadly attack Plaintiff's allegations of fraud, the bulk of

the CLC Defendants' briefing focuses on Plaintiff's failure to plead with

particularity the submission of false claims.  (Def. Br. 11-18).  As previously

mentioned, in order for claims brought under §§ 3729(a)(1)(A) and (a)(1)(B) to

survive a motion to dismiss, a plaintiff "must plead the submission of a false

claim with a high enough degree of particularity that defendants 'can

reasonably identify particular false claims for payment that were submitted to

the government.'"  *Kester*, 23 F. Supp. 3d at 257-58 (quoting *United States ex

rel. Karvelas* v. *Melrose-Wakefield Hosp.*, 360 F.3d 220, 232 (1st Cir. 2004)).

Although the Second Circuit has yet to provide clear guidance as to what

information plaintiffs must provide in order to plead false claims with

particularity, sister courts have required:

> [D]etails concerning the dates of the claims, the content
> of the forms or bills submitted, their identification
> numbers, the amount of money charged to the
> government, the particular goods or services for which
> the government was billed, the individuals involved in
> the billing, and the length of time between the alleged
> fraudulent practices and the submission of claims
> based on those practices ... .  These details do not
> constitute a checklist of mandatory requirements that
> must be satisfied by each allegation included in a
> complaint.  However, ... some[] of this information for at

> least some of the claims must be pleaded in order to
> satisfy Rule 9(b).

*United States ex rel. Bilotta* v. *Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 510 (S.D.N.Y. 2014) (quoting *United States ex rel. Polansky* v. *Pfizer, Inc.*, No. 04 Civ. 704 (ERK), 2009 WL 1456582, at *5 (E.D.N.Y. May 22, 2009)).

Despite multiple amendments, the SAC contains none of the above information. Indeed, there is not a single allegation of an actual false claim being submitted for reimbursement. Instead, the SAC alleges a variety of ways in which the CLC Defendants failed to meet standards set by regulations and then leaves to the reader's imagination whether false claims were submitted.

Of course, "Rule 9(b) does not require that every *qui tam* complaint provide details of actual bills or invoices submitted to the government," but this relaxed standard of pleading is only permissible when, *inter alia*, "information about the details of the claims submitted are peculiarly within the opposing party's knowledge." *Chorches*, 865 F.3d at 93. Plaintiff argues that this relaxed standard should apply here, claiming that "Relator could never himself assemble the documents." (Pl. Opp. 9). However, as a reason for why Relator could not provide any details about actual bills or invoices, Plaintiff merely claims, without substantiation, that the facts were peculiarly within the opposing party's knowledge. (*Id.* at 9-10).

Plaintiff's own SAC belies her argument. Although the SAC never identifies Relator's exact position at CLC, it makes clear that he had access to CLC's records and documents and was privy to detailed information regarding CLC's operations. (*See, e.g.*, SAC Ex. C (noting that Relator was, *inter alia*,

23

responsible for maintaining all records and documents relating to reportable incidents, serious reportable incidents, and allegations of abuse, and coordinated provision of files and documents for the completion of state agency surveys)).  The SAC also alleges that Relator had access to HCBS documentation (*id.* at ¶ 52), and that Relator himself was asked to fraudulently initial Checklists (*id.* at ¶ 50), indicating that Relator would have had at least some access to specific information about submitted false claims.  Any reading of the SAC shows that Relator's position at CLC in no way justifies relaxing Rule 9(b)'s standards.  *Cf. Chorches*, 865 F.3d at 82 (finding that information about particular bills was peculiarly within defendant's knowledge because relator was prohibited from entering the building where billing took place and was unable to participate in defendant's billing procedures).

Given that Plaintiff cannot show that information about submitted claims was peculiarly within the CLC Defendants' knowledge, the Court cannot excuse Plaintiff's failure to allege details regarding any submitted claim.  Plaintiff has failed to allege the submission of any claim — "the *sine qua non* of a False Claims Act violation," *Bilotta*, 50 F. Supp. 3d at 510 (quoting *United States ex rel. Clausen* v. *Lab. Corp. of Am., Inc.*, 290 F.3d 1301, 1311 (11th Cir. 2002)) — and therefore Plaintiff's §§ 3729(a)(1)(A) and (a)(1)(B) claims cannot survive a motion to dismiss.  The same goes for Plaintiff's § 3729(a)(1)(G) claim, because Plaintiff has failed to allege that the CLC Defendants "had any obligation to repay to the federal government any funds [they] received," having failed to allege that the CLC Defendants "caused the submission of false claims to the

federal government." *See Gelbman*, 790 F. App'x at 249-50 (finding that relator failed to state a § 3729(a)(1)(G) claim because he failed to plead with particularity the submission of any false claims).

>    **b.    Plaintiff Has Failed to Allege Falsity**

Even if the Court were to assume that Plaintiff had successfully met the requirements of Rule 9(b), there would be an additional reason why Plaintiff has failed to state any claim of fraud.  Specifically, Plaintiff has failed to allege falsity as required under the FCA.  As already noted, only false or fraudulent claims are actionable under the FCA.  *See Universal Health Servs.,* 136 S. Ct. at 1999 (quoting 31 U.S.C. § 3729(a)(1)(A)).  Plaintiffs may prove falsity under three potential theories of liability:

> [i] a factually false theory, under which a claim for payment is made to the government seeking payment for services that were never actually provided or for which the description of the goods or services provided is incorrect; [ii] an express false legal certification theory, where a claim for payment of federal funds falsely certifies compliance with a statute or regulation that must be complied with before payment can be made; and [iii] an implied false legal certification theory, where, although the claim for payment does not certify compliance with a statute or regulation on its face, compliance is a prerequisite to payment under the express statutory or regulatory terms.

*N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d at 293 (quoting *United States v. Empire Educ. Corp.*, 959 F. Supp. 2d 248, 255 (N.D.N.Y. 2013)).  Here, the Court understands Plaintiff to rely on the implied false legal certification theory, given the SAC's focus on the CLC Defendants' alleged failure to comply with various New York regulations.  (*See* SAC ¶¶ 29-41 (detailing the various

25

regulations with which the CLC Defendants were required to comply as a condition of payment)).[6]

Plaintiff has plainly alleged that the CLC Defendants failed to comply with numerous regulations (*see, e.g.*, SAC ¶¶ 50, 56, 62, 66), and that compliance with those regulations was a condition of payment for the CLC Defendants' Medicaid claims (*see id.* at ¶¶ 31-22, 36-38).  However, "a misrepresentation about compliance with a statutory, regulatory, or contractual requirement *must be material* to the Government's payment decision in order to be actionable under the False Claims Act."  *Universal Health Servs.,* 136 S. Ct. at 2002 (emphasis added).  "The materiality standard is demanding," and "[a] misrepresentation cannot be deemed material merely because the Government designates compliance with particular statutory, regulatory, or contractual requirement as a condition of payment."  *Id.* at 2003.  The Supreme Court has advised:

> [T]he Government's decision to expressly identify a provision as a condition of payment is relevant, but not automatically dispositive.  Likewise, proof of materiality can include, but is not necessarily limited to, evidence that the defendant knows that the Government consistently refused to pay claims in the mine run of cases based on noncompliance with the particular statutory, regulatory, or contractual requirement. Conversely, if the Government pays a particular claim in full despite its actual knowledge that certain

---

[6]     Although the SAC alleges that staff members were asked to sign Checklists for services that were not performed (SAC ¶¶ 53-54), which would fall under the factually false theory of liability, Plaintiff offers only conclusory assertions of this occurring. Therefore, insofar as Plaintiff relies on its allegations that Checklists were submitted for services that were never provided, the Court finds that Plaintiff has failed to meet both the plausibility standards of *Bell Atlantic. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007), and the heightened pleading standards of Rule 9(b).

> requirements were violated, that is very strong evidence
> that those requirements are not material.

*Id.* In short, the central inquiry is whether the Government would have refused to reimburse the CLC Defendants if it had known of their noncompliance with the various regulations cited in the SAC. *See N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d at 296 (explaining that, to survive a motion to dismiss, relators must allege "that the government would have refused reimbursement had it known of Northern Adult's noncompliance with Title VI and the cited DOH regulations"); *cf. Coyne*, 717 F. App'x at 29 (explaining that plaintiff's complaint "must present concrete allegations from which the court may draw the reasonable inference that the misrepresentations … caused the Government to make the reimbursement decision").

Plaintiff has failed to meet the materiality standard set by the Supreme Court in *Universal Health Services*. All that the SAC does is note various regulations with which the CLC Defendants were required to comply and allege behavior that violates those regulations. It does not provide any basis from which this Court can infer that either the United States or New York would have refused to reimburse the CLC Defendants if it had known of the CLC Defendants' various regulatory infractions. Plaintiff argues that the SAC alleges "fundamental violations that directly affect the health and safety of consumers" (Pl. Opp. 16), but there is no indication in the SAC that the United States or New York would have considered the violations so fundamental that they would have refused reimbursement. And because Plaintiff has failed to allege that the CLC Defendants' noncompliance was material, Plaintiff has

27

failed to state a claim under either 31 U.S.C. § 3729 or N.Y. State Fin. Law
§ 189.  Accordingly, Plaintiff's claims brought under those sections are
dismissed.[7]

### 3.    Plaintiff Has Adequately Alleged Retaliation

In addition to her claims of fraud, Plaintiff has brought claims of
retaliation under 31 U.S.C. § 3730(h) and N.Y. State Fin. Law § 191.  Plaintiff
contends that Relator raised multiple issues about CLC's practices to Stile, and
that he was retaliated against both when CLC reduced his job responsibilities
in October 2014 and when he was fired in December 2014.  (Pl. Opp. 19-20).
In order to plead a claim of retaliation under the FCA, a relator is generally
required to show that (i) "he engaged in activity protected under the statute";
(ii) "the employer was aware of such activity"; and (iii) "the employer took
adverse action against him because he engaged in the protected activity."
*Chorches*, 865 F.3d at 95.  Unlike the fraud provisions of the FCA, "[a] plaintiff
need not plead an FCA retaliation claim with particularity because no showing
of fraud is required."  *N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d at 297.

The CLC Defendants do not challenge that Plaintiff has adequately
alleged that Relator engaged in protected activity or that CLC was aware of

---

[7]    In addition to challenging Plaintiff's claims under §§ 3729(a)(1)(A) and (a)(1)(B), as well
as N.Y. State Fin. Law §§ 189(1)(a) and (1)(b), the CLC Defendants devote a portion of
their briefing to the issue of whether Plaintiff has adequately alleged an FCA conspiracy
claim in regards to CLC's relationship with Creative Escapes, LLC.  (*See* Def. Br. 18-19).
However, Plaintiff does not state any claims under 31 U.S.C. § 3729(a)(1)(C), the
conspiracy provision of the FCA.  Moreover, even if Plaintiff did intend to allege a
conspiracy claim, Plaintiff would have had to show "an unlawful agreement ... to violate
the FCA."  *United States ex rel. Kester* v. *Novartis Pharm Corp.*, 23 F. Supp. 3d 242, 268
(S.D.N.Y. 2014).  The SCA alleges no such agreement, and therefore any conspiracy
claim must fail.

such activity.  Instead, the CLC Defendants argue that Plaintiff has failed to allege any causal connection between the protected activity and any acts of retaliation.  (Def. Br. 19).  "[T]emporal proximity can support an inference of retaliation for purposes of establishing a *prima facie* case" of retaliation, but "the proximity must be 'very close.'"  *Dhar* v. *City of New York*, 655 F. App'x 864, 865-66 (2d Cir. 2016) (summary order) (citing *Abrams* v. *Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014)).  There is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship," *Summa* v. *Hofstra Univ.*, 708 F.3d 115, 128 (2d Cir. 2013) (quoting *Espinal* v. *Goord*, 558 F.3d 119, 129 (2d Cir. 2009)), although some "courts have found that … a seven-month gap between the protected conduct and retaliatory action may be 'on its own … too attenuated to give rise to an inference of but-for causation,'" *Alvarado* v. *Mount Pleasant Cottage Sch. Dist.*, 404 F. Supp. 3d 763, 785 (S.D.N.Y. 2019) (quoting *Avillan* v. *Brennan*, No. 16 Civ. 5611 (AJN) (RLE), 2018 WL 4680027, at *5 (S.D.N.Y. Sept. 28, 2018)).

The CLC Defendants seem to argue that Relator cannot allege a causal link between any protected activity and his termination in December 2014 because Relator had been engaging in protected activity as early as 2011, and yet he continued to work for CLC for an additional three years.  (Def. Reply 10).[8]  Were it the case that Relator's only complaints to management

---

[8]    It is unclear to the Court whether Plaintiff is asserting that the reduction in Relator's job responsibilities in October 2014 constituted an adverse action, given that Plaintiff's briefing focuses primarily on Relator's termination.  (*See* Pl. Opp. 19-20).  Moreover, it

occurred in 2011, the Court would agree that the temporal link is too attenuated to allege causation adequately.  Similarly, if the SAC merely alleged that Relator constantly made complaints of a similar degree throughout his years of employment with CLC, the Court would not be able to find that Plaintiff has alleged a causal link.  *See McCullough* v. *Wyandanch Union Free Sch. Dist.*, 187 F.3d 272, 280 (2d Cir. 1999) (holding that where appellee engaged in protected activity "over the entire course of his employment," the facts rendered "unremarkable any temporal connection between any particular speech by appellee and the [adverse action]"); *McAllan* v. *Von Essen*, 517 F. Supp. 2d 672, 683 (S.D.N.Y. 2007) ("[T]he fact that plaintiff frequently criticized the City and the FDNY renders unremarkable any temporal connection between any particular speech by plaintiff and the filing of disciplinary charges.").

The SAC, however, alleges something wholly different.  According to the SAC, Relator had a detailed conversation with Stile on November 5, 2014, about a variety of issues he had discovered at CLC, including the novel issue of Ms. C engaging in sexual activities with another consumer.  (SAC ¶ 93).  At roughly the same time, Relator filed a series of incident reports with the Justice Center about ongoing issues at CLC.  (*Id.* at ¶ 96).  The SAC further alleges

---

would be difficult for the Court to discern whether Plaintiff has adequately alleged retaliation based on the reduction in job responsibilities, given that the SAC does not provide specific dates for either any protected activity prior to the reduction or for the reduction itself.  *See Delgado* v. *Triborough Bridge & Tunnel Auth.*, 485 F. Supp. 2d 453, 462 (S.D.N.Y. 2007) (explaining that plaintiff "must give specific dates of retaliatory actions" in order to allege temporal proximity).  However, the Court sees no need at this stage to decide, as a matter of law, whether Plaintiff has stated a claim of retaliation based on the reduction in Relator's job responsibilities.

that Stile and Porcella either discovered or suspected that Relator had filed the aforementioned reports with the Justice Center (*id.* at ¶¶ 92, 96), and that Relator was then fired just over a month later, on December 14, 2014 (*id.* at ¶ 92). These allegations — of Relator making a detailed complaint to his supervisor, filing reports with a governmental body, and then being fired six weeks later — are more than enough to plead an actionable retaliation claim, both because there is adequate temporal proximity and because the alleged complaints are distinct from any prior alleged complaints. *See Kempkes* v. *Downey*, No. 07 Civ. 1298 (KMK) (GAY), 2008 WL 852765, at *4-5 (S.D.N.Y. Mar. 31, 2008) (finding that temporal connection still existed, despite plaintiff having made same complaints repeatedly over a four-year span, because plaintiff alleged a specific and distinct complaint immediately prior to an adverse action).

In sum, the Court finds that Plaintiff has failed to state a claim under either 31 U.S.C. § 3729 or N.Y. State Fin. Law § 189, both because Plaintiff has failed to plead with particularity the submission of any false claim and because Plaintiff has failed to plead falsity. Accordingly, the CLC Defendants' motion to dismiss is granted as to Plaintiff's federal and state claims of fraud. However, the Court finds that Plaintiff has alleged a viable retaliation claim under 31 U.S.C. § 3730(h) and N.Y. State Fin. Law § 191, and therefore denies the CLC Defendants' motion to dismiss as to those claims. Finally, given Plaintiff's failure to serve Defendants Creative Escapes, LLC, Lulgjuray, Mungovan, and Jurczak — despite the Court's grant of additional time to serve (Dkt. #52) —

the Court dismisses all claims against those Defendants without prejudice pursuant to Rule 4(m).

## CONCLUSION

For the reasons set forth in this Opinion, the CLC Defendants' motion to dismiss is GRANTED as to Plaintiff's claims under 31 U.S.C. § 3729 and N.Y. State Fin. Law § 189 and DENIED as to Plaintiff's claims under 31 U.S.C. § 3730(h) and N.Y. State Fin. Law § 191.  Moreover, all of Plaintiff's claims against Defendants Creative Escapes, LLC, Lulgjuray, Mungovan, and Jurczak are DISMISSED without prejudice for failure to serve.

The Clerk of Court is directed to terminate the motion at docket entry 57. On or before **June 5, 2020**, the CLC Defendants shall file a responsive pleading.  On or before **June 12, 2020**, the parties shall submit a proposed Case Management Plan, as well as the joint status letter contemplated by the Plan.

SO ORDERED.

Dated:     May 14, 2020
           New York, New York

_____
      KATHERINE POLK FAILLA
      United States District Judge

32